## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DARRIN F. GRAY,
     Plaintiff,

     Case No. 1:14-cv-283
     Dlott, J.
     Litkovitz, M.J.

     vs.

COMMISSIONER OF
SOCIAL SECURITY,
     Defendant.

     **REPORT AND**
     **RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI). This matter is

before the Court on plaintiff's Statement of Errors (Doc. 11), the Commissioner's response in

opposition (Doc. 16), and plaintiff's reply (Doc. 20).

## I. Procedural Background

Plaintiff filed applications for DIB and SSI in June of 2009, alleging disability since

March 25, 2009, due to sleep apnea, alcoholism, and bipolar disorder. Plaintiff's applications

were denied initially and upon reconsideration. Plaintiff requested and was granted a *de novo*

hearing before administrative law judge (ALJ) Larry A. Temin. Plaintiff, plaintiff's wife Ruby

Gray, plaintiff's case manager Cherie Groman, a vocational expert (VE), and an impartial

medical expert (ME), appeared and testified at the ALJ hearing. Plaintiff was represented by a

non-attorney representative at the hearing. On October 2, 2012, the ALJ issued a decision

denying plaintiff's DIB and SSI applications. Plaintiff's request for review by the Appeals

Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment - *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities - the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.,* 582 F.3d 647, 652 (6th Cir. 2009) (citing §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.; Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir.

2

2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] meets the insured status requirements of the Social Security Act through September 30, 2016.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity (SGA) since March 25, 2009, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: schizoaffective disorder; alcohol dependence/abuse; borderline intellectual functioning (estimated); and left shoulder arthritis and history of rotator cuff tear (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the [ALJ] finds that the [plaintiff] has the residual functional capacity to perform work activity except as follows: The [plaintiff] can lift/carry and push/pull up to 20 pounds occasionally and 10 pounds frequently. He is limited to no more than occasional reaching above shoulder level with the (dominant) left upper extremity. The [plaintiff] is able to perform only simple, routine, repetitive tasks and is able to understand, remember, and carry out only short and simple instructions. He can sustain concentration and attention for two hours at a time, and then requires a rest break of five minutes. He cannot interact with the general public, and his job should not require more than superficial and minimal interaction with co-workers and supervisors. He cannot work at a rapid production-rate pace. His job should not require more than ordinary and routine changes in work setting or duties. The [plaintiff] is able to make only simple work-related decisions.

3

6. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[1]

7. Born [in] 1966, the [plaintiff] was 43 years old, which is defined as a "younger individual age 18-49," on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the [plaintiff's] past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that he can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[2]

11. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from March 25, 2009, through the date of [the ALJ's] decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 22-33).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by

substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v.*

*Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.,*

478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence

as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*,

---

[1] Plaintiff's past relevant work was as a cook helper/dishwasher, which is unskilled work performed at the medium exertional level. (Tr. 32).

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled occupations such as housekeeping/cleaner (1,900 jobs regionally and 328,000 jobs nationally), garment inspector (873 jobs regionally and 91,000 jobs nationally), and street cleaner (1,500 jobs regionally and 164,000 jobs nationally). (Tr. 33).

(1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination.  Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right."  *Rabbers,* 582 F.3d at 651 (quoting *Bowen,* 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D.  Specific Errors

On appeal, plaintiff presents three assignments of error: (1) the ALJ erred by failing to give proper weight to the opinions of plaintiff's treating and examining mental health sources; (2) the ALJ erred by failing to properly weigh the ME's opinion, which is not supported by the medical evidence; and (3) the ALJ erred by failing to consider plaintiff's "ability to sustain work."  (Doc. 11).  Because the first two assignments of error are closely related, the Court has combined these assignments of error and considered them together.

### 1.  The ALJ did not err in weighing the opinions of the mental health sources of record.

"The Commissioner has elected to impose certain standards on the treatment of medical source evidence."  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  "These standards, set forth in administrative regulations, describe (1) the various types of evidence that the Commissioner

5

will consider, 20 C.F.R. § 404.1512; (2) who can provide evidence to establish an impairment, 20 C.F.R. § 404.1513; and (3) how that evidence will be evaluated, 20 C.F.R. § 404.1520b." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013). This evidence may include "medical opinions, which 'are statements from physicians and psychologists . . . that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [ ] symptoms, diagnosis and prognosis,' physical and mental restrictions, and what the claimant can still do despite his or her impairments." *Id*. (citing 20 C.F.R. 404.1527(a)(2)).

The applicable regulations set forth three types of acceptable medical sources upon which an ALJ may rely: treating source, nontreating source, and nonexamining source. 20 C.F.R. §§ 404.1502, 416.902. When treating sources offer opinions, the Social Security Administration is to give such opinions the most weight and is procedurally required to "give good reasons in [its] notice of determination or decision for the weight [it gives the claimant's] treating source's opinion." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). This requirement only applies to treating sources. *Id*. at 876. The opinion of a non-treating but examining source is entitled to less weight than the opinion of a treating source, but is generally entitled to more weight than the opinion of a source who has not examined the claimant. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). *See also Smith*, 482 F.3d at 875. When deciding the weight to give a non-treating source's opinion, the ALJ should consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c). Because a non-examining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for his opinions and

6

the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. *Id*. "In appropriate circumstances, opinions from State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources." *Blakley*, 581 F.3d at 409. One example is when the "State agency medical . . . consultant's opinion is based on a review of a complete case record that . . . provides more detailed and comprehensive information than what was available to the individual's treating source." *Id.*

In this case, the ALJ was faced with conflicting evidence from the various medical and other sources in the record, some of which suggested that plaintiff was fabricating the severity of his mental illness. On the one hand, the March 2009 opinion of a state agency reviewing psychologist (Tr. 447-60), the November 2009 opinion of consultative examining psychologist Dr. George Lester, Psy.D., the July 2010 opinion of treating psychiatrist Dr. Cathy Whitaker, M.D. (Tr. 532-34), and the March 2012 opinion of treating psychiatrist Dr. Sharon Stanford, M.D. (Tr. 739-44) support a finding of disability. In contrast, the hearing testimony of psychiatric medical expert Dr. Alfred Jonas, M.D., the April 2011 opinion of treating psychiatrist Dr. Carlos Cheng, M.D. (Tr. 575-77), the November 2010 opinion of state agency reviewing psychologist Dr. Aracelis Rivera, Psy.D., the April 2011 opinion of state agency reviewing psychologist Dr. Caroline Lewin, Ph.D. (Tr. 581-97), and the July 2010 Cooperative Disability Investigations Unit (CDIU) report (Tr. 745-52) support a finding that plaintiff was malingering when he presented himself for mental health treatment and was not as limited as he alleged. The ALJ resolved this conflict against plaintiff. Even if this Court would have resolved the conflict differently or the evidence supports a contrary conclusion, the Court must uphold the ALJ's decision if it is supported by substantial evidence. *Cutlip v. Sec'y of Health & Human Servs.*, 25

7

F.3d 284, 286 (6th Cir. 1994). It is not the role of the reviewing court to resolve such conflicts in the evidence; the Court's review is limited to determining whether substantial evidence supports the ALJ's conclusion. *Id*. As discussed below, the ALJ cited ample evidence to show there were numerous inconsistencies in the record concerning plaintiff's behavior which raised questions about his credibility and the reliability of several mental health reports of record. The Court determines that the ALJ's resolution of this conflict and his weighing of the various medical opinions of record are supported by substantial evidence.

In his decision, the ALJ evaluated and weighed several assessments of plaintiff's mental functioning, including the assessment of consultative examining psychologist Dr. Lester, who diagnosed schizophrenia, alcohol abuse, substance abuse in reported remission, and personality disorder. Dr. Lester reported that during the examination, plaintiff spoke of "his pony" and was carrying a "bowlful of dried grass and leaves" which plaintiff stated was for the purpose of feeding his pony. (Tr. 504). Plaintiff commented several times during the interview that he needed to go outside and feed his pony, whom plaintiff described as his only friend. (Tr. 504-05). When plaintiff spoke of his pony, "he tended to smile and to talk in a childlike manner." (*Id*.). During a brief break in the examination, plaintiff "practically ran from the office to go outside to feed the pony" and made "high pitched screaming noises" which plaintiff later told Dr. Lester were actually made by his pony because she was sad when plaintiff was inside. (*Id*.). Plaintiff was also observed "to lean over the rail outside and to drool for several seconds onto the ground." (*Id*.). Dr. Lester opined that plaintiff was "severely" impaired in his ability to relate to others; maintain attention, concentration, persistence and pace to perform routine tasks; and withstand normal work stress. (Tr. 509).

8

Following Dr. Lester's examination, a state agency consultant requested a CDIU investigation based on a determination that plaintiff's "bizarre behavior" during that examination and plaintiff's report of hallucinations during a July 2009 intake examination at Mental Health Access Point (MHAP) were inconsistent with plaintiff's demeanor during 2008 and 2009 hospitalizations for physical complaints. (*See* Tr. 28, citing Tr. 461-75). On July 13, 2010, the CDIU investigators reported that when they went to plaintiff's home, he initially attempted to hide his identity because he thought the investigators had come on a child support matter or to arrest him for an assault he had committed some months earlier; however, plaintiff admitted his true identity when asked to produce identification. (Tr. 750). The investigators reported that plaintiff's appearance was appropriate. He was pleasant and cooperative, he laughed and joked during the interview, he was very talkative, he spoke in a clear and concise voice, and he carried on a normal conversation. He did not need anything to be simplified or repeated, and he asked several questions relevant to the questions asked of him. He appeared very comfortable talking with the investigators and maintained good eye contact. He did not exhibit any unusual behavior or make any odd noises or gestures. He told the investigators that he had recently applied for a job at a restaurant and did not know yet if he had gotten the job. Plaintiff also informed the investigators that he has a credit union debit card which he uses when he has money in the account; he had taken the Greyhound bus by himself to Tennessee three weeks earlier to visit his brother and stayed for two weeks; he shops at the local Kroger and other local stores on a regular basis; and he attends his local church on a regular basis. (Tr. 745-52).

The ALJ discounted Dr. Lester's assessment on the grounds plaintiff's "bizarre behavior" during the consultative examination was not representative of plaintiff's behavior in other circumstances and with other medical providers, and there were "serious questions" about the

credibility of plaintiff's interview with Dr. Lester which undermined the assessment. (Tr. 31). In making this determination, the ALJ reasonably relied on the results of the CDIU report and the testimony of Dr. Jonas, the medical expert who testified at the hearing, who reviewed the medical evidence of record and considered plaintiff's testimony at the ALJ hearing. Dr. Jonas testified that various portions of the records, and most clearly the CDIU report, demonstrated what appeared to be "substantial distortion or potentially . . . contrivance" that could distort a great deal of the record. (Tr. 88). Dr. Jonas questioned whether a Listing 12.03 diagnosis (Schizoaffective, paranoid, and psychotic disorders) was warranted because he found no indicators of schizophrenia in the records other than plaintiff's assertions of hallucinations, which Dr. Jonas testified sounded "manipulated" and "contrived," even when the CDIU report was not considered. (Tr. 89). Dr. Jonas noted that plaintiff's accounts of his hallucinations varied in that plaintiff sometimes reported seeing one pony and sometimes more than one pony, but at the hearing he testified about interacting with imaginary people. (*Id.*). Dr. Jonas testified that non-medical professionals did not observe the type of affect associated with schizophrenia but instead experienced plaintiff as "normal" and "totally functional." (*Id.*). In addition, there was no indication of the "kind of thought disorder with abnormal associations" seen with schizophrenia. (*Id.*). Dr. Jonas testified that these inconsistencies appeared to be "persistently odd" until the CDIU report was reviewed. (Tr. 90-91). He opined that an individual who is as functionally impaired as plaintiff presented to Dr. Lester would most likely not be treated in an outpatient setting, would not have the control to "hide" his symptoms from the CDIU investigators, and would not have appeared as "normal and fully functioning" to the investigators. (Tr. 100).

10

The ALJ reasonably relied on the results of the CDIU report which contrasted sharply with prior reports of bizarre behavior and showed no indication of hallucinations, paranoid ideation, or any other abnormal behavior, as well as the testimony of Dr. Jonas, to discount Dr. Lester's findings. (Tr. 32, citing 745-52). The ALJ's decision that Dr. Lester's assessment was not reliable in light of inconsistencies which called plaintiff's credibility into question is substantially supported by the record and should not be disturbed.

Instead of crediting Dr. Lester's report, that ALJ gave "significant weight" to the opinion of Dr. Jonas, who opined that plaintiff has "marked" difficulties with social functioning and should be restricted to jobs that involve no public contact, only minimal and casual interaction with others, and no teamwork. (Tr. 32, 97). Plaintiff alleges this was error because Dr. Jonas' opinions are not supported by any medical evidence. (Doc. 11 at 17-19). Plaintiff alleges that Dr. Jonas relied almost exclusively on the "opinions" of the CDIU investigators, who are not trained medical professionals, in determining that plaintiff's symptoms and reports are not valid. (*Id*. at 17). Plaintiff alleges that other than the ME's opinion and the CDIU report, there is no evidence in the record that plaintiff fabricated his symptoms. Plaintiff argues that the ALJ erred by relying on the ME's interpretation of the evidence over plaintiff's consistent subjective complaints to his treating physicians and testimony by plaintiff's wife and case manager corroborating his subjective complaints. (*Id*. at 19).

The ALJ did not err in weighing Dr. Jonas' opinions for the reasons stated by plaintiff. The purpose of a medical expert is to advise the ALJ on medical issues and answer specific questions about the claimant's impairments, the medical evidence, the application of the listings, and functional limitations based on the claimant's testimony and the record. *See* 20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii). Medical expert testimony consistent with the evidence of

11

record can constitute substantial evidence to support the Commissioner's decision. *See Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 570 (6th Cir. 1989). Because a nonexamining source has no examining or treating relationship with the claimant, the weight to be afforded the opinion of a nonexamining source depends on the degree to which the source provides supporting explanations for his opinions and the degree to which his opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources. 20 C.F.R. §§ 404.1527(c), 416.927(c). "A non-examining physician's opinion may be accepted over that of an examining physician when the non-examining physician clearly states the reasons that his opinions differ from those of the examining physicians." *Lyons v. Social Security Admin.*, 19 F. App'x 294, 302 (6th Cir. 2001) (citing *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (ALJ was entitled to accept nonexamining medical advisor's opinion as to the severity of the plaintiff's impairments where, to the extent the medical advisor's conclusions differed from those of the examining psychologist, the medical advisor explained his position by reference to the objective medical and psychological reports in the plaintiff's file, as well as the undisputed facts concerning the plaintiff's prior work and social history).

Here, Dr. Jonas, a psychiatrist, was qualified to give an opinion on plaintiff's mental limitations, and he discussed the reasons for his opinions and why his opinions differed from the assessments of the mental health sources imposing extreme limitations. *See Lyons*, 19 F. App'x at 302. As plaintiff concedes, the record includes conflicting evidence and inconsistencies. It was the ALJ's duty to resolve these conflicts, and this Court's review is limited to determining whether substantial evidence supports the ALJ's conclusion. *Cutlip*, 25 F.3d at 286. The ALJ explained why he credited Dr. Jonas' opinions over the opinions of the mental health sources who assessed extreme limitations. Substantial evidence supports the ALJ's determination that

12

the opinions assessing extreme limitations were not reliable in view of material inconsistencies in the record which raised issues as to whether plaintiff was fabricating psychotic symptoms. The ALJ was entitled to adopt Dr. Jonas' opinions for these reasons, and there is no basis for disturbing his decision.

The ALJ also gave "significant weight" to the opinion of nonexamining state agency psychologist Dr. Lewin. (Tr. 32). Dr. Lewin reviewed the record and issued an assessment of plaintiff's mental functioning in April 2011. (Tr. 581-97). She concluded that plaintiff would be able to cope with simple instructions, maintain at least short-term concentration, and cooperate superficially in a routine setting without many changes, although he may need some reminders and prompts for appointments and tasks from a supervisor. (Tr. 597). The ALJ found that Dr. Lewin's opinion was more reliable than the opinions of treating psychiatrists Dr. Whitaker and Dr. Stanford because she had a more complete record to consider. (Tr. 32). Specifically, Dr. Lewin had reviewed all of the records subsequent to the CDIU investigation, including the assessment of treating psychiatrist Dr. Cheng who reported no limitations on concentration, following directions, social interaction, and dealing with work pressure, and the comments of plaintiff's case manager from April 2011 stating that plaintiff had been medication compliant for approximately the past three months and would keep all appointments if reminded one or two days in advance. (Id.).

Plaintiff alleges that the ALJ's decision to credit Dr. Lewin's opinion was illogical and erroneous because "the majority of the evidence concerning plaintiff's mental health treatment," including Dr. Stanford's report and the treatment notes from Centerpoint Health, were submitted after Dr. Lewin issued her assessment. (Doc. 11 at 17; Doc. 20 at 5). However, the fact that the nonexamining source did not have a complete case record before her does not preclude the ALJ

from crediting the opinion of a nonexamining source over the opinion of a treating source where the ALJ has provided some indication that he has considered this circumstance. *Blakley*, 581 F.3d at 409 (where the nonexamining sources did not have the opportunity to review several reports and psychiatrist's treatment records, "we require some indication that the ALJ at least considered these facts before giving greater weight to an opinion that is not based on a review of a complete case record."). Here, the ALJ acknowledged that Dr. Lewin's opinion was not based on a review of the complete case record; however, the ALJ thoroughly explained in his opinion why, under the particular circumstances of this case, a medical opinion based on a review of records generated by individuals who had observed plaintiff in a variety of settings was more reliable than the opinions of plaintiff's treating psychiatrists who did not have access to these other records and who imposed extreme limitations. (Tr. 28-32). Accordingly, the ALJ did not err by giving "significant weight" to Dr. Lewin's opinion.[3]

Nor did the ALJ err by declining to give "controlling weight" to the opinions of plaintiff's treating psychiatrists, Dr. Stanford and Dr. Whitaker. (Tr. 31). Dr. Whitaker completed a mental status questionnaire dated July 8, 2010, in which she reported that she had first seen plaintiff on December 1, 2009, and had last seen him on July 8, 2010. (Tr. 532-34). She diagnosed plaintiff with schizoaffective disorder and personality disorder for which he was prescribed Risperdal and Lithium. Dr. Whitaker reported that plaintiff had a limited attention span and he needed reminders to follow directions, he had no social interaction outside his family, and he had trouble with new situations and change. She opined that plaintiff could not

---

[3] Plaintiff also states that the ALJ did not address the nonexamining state agency psychologist's report dated March 25, 2009, assessing "marked" restriction of activities of daily living and "marked" difficulties in maintaining concentration, persistence or pace. (Doc. 11 at 17, citing Tr. 457, 459). However, plaintiff does not set forth any arguments to show the ALJ erred in this regard and he has therefore waived any alleged error related to this issue. *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

14

hold a job "due to lack of focus," he prefers a routine, he has trouble completing tasks, and he is "confrontational in many situations." (Tr. 532-33).

The ALJ declined to give "controlling weight" to Dr. Whitaker's opinion that plaintiff could not hold a job "due to lack of focus" because her records demonstrated that plaintiff's symptoms improved on the prescribed medications when plaintiff remained compliant. (Tr. 31). The ALJ instead gave the opinion only "some weight," noting that Dr. Whitaker was a psychiatrist and a treating source but she did not have access to records other than those from Centerpoint Health, the treatment center where she treated plaintiff; medical records related to plaintiff's treatment for physical complaints showed no evidence of aberrant behaviors or altered mental status; and Dr. Whitaker did not comment on how plaintiff's noncompliance with medication and ongoing alcohol abuse affected his functioning. Plaintiff does not challenge the ALJ's evaluation of Dr. Whitaker's opinion as flawed or unsupported by the record other than to assert in the reply brief that Dr. Whitaker did not note "complete relief of symptoms or an ability to maintain employment while taking medication." (Doc. 20 at 3). Plaintiff's allegations do not show that the ALJ erred in weighing Dr. Whitaker's opinion. The ALJ gave "good reasons" for affording only "some weight" to Dr. Whitaker's opinion that plaintiff could not hold a job due to problems with concentration. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ did not err in this regard.

The ALJ also gave "good reasons" for declining to give "controlling weight" to Dr. Stanford's opinion that plaintiff has "no useful ability to function" in the areas of maintaining attention and concentration for two-hour segments, working in coordination with or in proximity to others, getting along with co-workers or peers, and dealing with normal work stress. (Tr. 31, citing Tr. 741). The ALJ noted that Dr. Stanford signed the medical source statement attributed

15

to her only five days after she first saw plaintiff on March 16, 2012, and a "major portion" of the questionnaire appeared to have been filled out by another individual who did not co-sign the form. (Tr. 32). Plaintiff alleges it was illogical for the ALJ to discount Dr. Stanford's opinion on this ground because the ALJ credited Dr. Cheng's opinion despite his relatively brief treatment relationship with plaintiff. (Doc. 11 at 16). However, Dr. Cheng indicated in his report that he had first seen plaintiff one month earlier and there is no indication that someone other than Dr. Cheng completed the report. (Tr. 575-77).

The ALJ also found Dr. Stanford's assessment was internally inconsistent, it was not supported by Dr. Stanford's own treatment notes, and it was not supported by other records from plaintiff's providers at Centerpoint. (Tr. 31). Plaintiff alleges that contrary to the ALJ's findings, Dr. Stanford's notes were not inconsistent with the record or her own treatment notes because plaintiff "consistently presented" with suicidal and homicidal ideations as well as auditory hallucinations, and he reported on one occasion that his medication made him feel sluggish. (Doc. 20 at 2, citing Tr. 858- 4/25/12 treatment note; Tr. 860- 3/16/12 treatment note). The ALJ nonetheless reasonably determined that despite plaintiff's subjective reports of these behavioral symptoms, the extreme limitations assessed by Dr. Stanford were not supported by the evidence in light of her notes showing that plaintiff's medications enabled him to control his behavior. (Tr. 31, citing Tr. 739). In addition, the ALJ reasonably discounted Dr. Stanford's opinion based on her lack of access to records generated outside of Centerpoint which suggested that plaintiff was fabricating his symptoms. These records included treatment records generated by health care providers who treated plaintiff for his physical complaints and who consistently reported a normal demeanor and no psychological abnormalities. (*See* Tr. 560, 1/3/11- judgment and insight were within normal limits, plaintiff was alert and oriented, no mood disorders were

16

noted, and his affect was "appropriate"; Tr. 555, 1/12/11- same; Tr. 552, 2/1/11- same; Tr. 605, 4/14/11-same; Tr. 601, 6/11-same; Tr. 616-36, 11/09-2011 hospital records - no reports of mental issues that interfered with plaintiff's treatment for physical problems).  The records also included the CDIU report discussed above, which contained no indication of hallucinations, paranoid ideation, or any other abnormal behavior and thus demonstrated that plaintiff presented normally outside a mental health setting.  (Tr. 745-52).  The ALJ also reasonably determined that the extreme limitations assessed by Dr. Stanford were inconsistent with plaintiff's demonstrated ability to take public transportation and maintain a job over the eight months preceding the ALJ hearing.  (Tr. 32).  Finally, the ALJ reasonably discounted Dr. Stanford's opinion on the ground she appeared to be unaware of plaintiff's present alcohol use and his history of non-compliance with medication and no-shows at scheduled appointments.  (*Id*.).  Plaintiff concedes that Dr. Stanford failed to address his non-compliance and alcohol use but states that Dr. Stanford indicated in her assessment that plaintiff's history of alcohol abuse does not contribute to his limitations and she would not change her assessment if plaintiff were totally abstinent from alcohol abuse.  (Doc. 20 at 2, citing Tr. 744).  While Dr. Stanford did note this, the ALJ properly considered Dr. Stanford's apparent lack of knowledge of plaintiff's current alcohol use when evaluating her opinion.  The ALJ gave good reasons for giving "little weight" to Dr. Stanford's opinion and those reasons find substantial support in the record.

Finally, the ALJ gave "significant weight" to the April 5, 2011 opinion of treating psychiatrist Dr. Cheng.  (Tr. 31, citing Tr. 576).  Dr. Cheng reported that he had treated plaintiff from March 8 to April 5, 2011.  (Tr. 575).  He described plaintiff's mental status as only mildly symptomatic, noting that plaintiff displayed an irritable mood and mildly blunted affect, a mildly circumstantial thought process, and limited to fair insight/judgment.  (*Id*.).  Dr. Cheng did not

17

report limitations in any work-related areas. (Tr. 576). The ALJ noted that Dr. Cheng had seen

plaintiff only briefly but he would have had access to the records from Drs. Whitaker and Indre

Rukseniene, M.D., plaintiff's earlier providers at Centerpoint, and thus would have been aware if

plaintiff were "truly as psychotic as described in testimony[.]"[4] (Tr. 31). The ALJ did not err by

crediting Dr. Cheng's assessment for these reasons.

Accordingly, the ALJ did not err in weighing the opinions of the mental health sources of

record. The ALJ thoroughly considered the evidence of record, examined the numerous

inconsistencies in the record which suggested that plaintiff may have been fabricating his

psychiatric symptoms, and weighed the conflicting mental health opinions in accordance with

the regulatory factors. *See* 20 C.F.R. §§ 404.1527(c), 416.927(c). The ALJ reasonably

determined that the mental assessments of those medical experts who were able to review

records which documented plaintiff's behavior across a variety of settings were the most reliable

under the circumstances presented here, and the ALJ's decision to afford the greatest weight to

the opinions of those mental health sources is substantially supported by the evidence. Plaintiff's

first and second assignments of error should be overruled.

**2. The ALJ did not err by failing to consider plaintiff's ability to perform work on a sustained basis.**

Plaintiff alleges as his third assignment of error that the ALJ erred by finding there was

"work that Plaintiff was capable of performing on a sustained basis." (Doc. 11 at 19-20).

Plaintiff argues he has lost a number of jobs due to his psychiatric symptoms and he would be

precluded from keeping a job for a sustained period of time due to his propensity to lash out at

---

[4] The ALJ noted in his decision that Dr. Rukseniene first saw plaintiff in January 2011 after being scheduled to take over his medical management in October 2010, and that Dr. Cheng took over plaintiff's medication reviews in March 2011. (Tr. 24)

co-workers and talk to imaginary people. (*Id.* at 20, citing Tr. 477, 479- 7/2/09 MHAP
diagnostic assessment; Doc. 20 at 5, citing Tr. 106-107).

An ALJ is required to incorporate into a hypothetical question only those limitations he
finds credible. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir.
1993). Here, in the hypothetical questions he posed to the VE, the ALJ imposed a number of
restrictions to account for plaintiff's mental limitations, including no interaction with the general
public and no more than superficial and minimal interaction with co-workers and supervisors to
account for his difficulties with social interaction. (Tr. 103-04). Plaintiff has not shown that the
ALJ erred by failing to impose additional restrictions to account for his mental limitations. The
ALJ thoroughly evaluated plaintiff's credibility and considered plaintiff's work history,
including the reasons plaintiff had lost a number of past jobs. (Tr. 27-32). The ALJ reasonably
concluded that plaintiff's past job terminations could not be attributed solely to plaintiff's
"alleged psychotic symptoms." (Tr. 27). Plaintiff does not challenge the ALJ's credibility
finding. Accordingly, plaintiff's third assignment of error should be overruled.

**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **AFFIRMED** and this matter be **CLOSED** on the
docket of the Court.

Date: 3/30/15

Karen L. Litkovitz
United States Magistrate Judge

19

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DARRIN F. GRAY,                                    Case No. 1:14-cv-283
      Plaintiff,                                Dlott, J.
                                                Litkovitz, M.J.


      vs.


COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.


**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).